UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KENNETH PHILLIPS,            )
                            )
              Plaintiff,     )
                            )
       v.                    )          No. 1:11 CV 105 JAR/DDN
                            )
MICHAEL J. ASTRUE,           )
Commissioner of Social Security  )
                            )
              Defendant.     )

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Kenneth Phillips for disability insurance
benefits under Title II of the Social Security Act (the Act), 42 U.S.C.
§ 423, et seq.  The action was referred to the undersigned United States
Magistrate Judge for review and a recommended disposition under 28 U.S.C.
§ 636(b).  For the reasons set forth below, the undersigned recommends
that the decision of the Administrative Law Judge (ALJ) be affirmed.

## I.  BACKGROUND

Plaintiff Kenneth Phillips, who was born in 1960, filed an
application for Title II benefits on May 2, 2008.  (Tr. 174-80.)  He
alleged a disability onset date of January 26, 2007, due to problems with
his neck and low back.  (Tr. 174, 232.)  His application was denied
initially on June 30, 2008, and he requested a hearing before an ALJ.[1]
(Tr. 85, 92-96.)

On June 18, 2010, following a hearing, the ALJ found that plaintiff
was not disabled.  (Tr. 21-30.)  On May 13, 2011, after considering
additional evidence, the Appeals Council denied plaintiff's request for

_____

[1]Missouri is one of several test states participating in
modifications to the disability determination procedures which apply in
this case.  20 C.F.R. §§ 404.906, 404.966 (2007).  These modifications
include, among other things, the elimination of the reconsideration step.
See id.

review.  (Tr. 1-3.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On May 13, 2008, plaintiff completed a Disability Report - Adult - form.  (Tr. 231-41.)  He reported having neck problems, back problems, and pain, and stated that he was unable to push, pull, lift over 15 to 20 pounds, squat, bend, or perform overhead work.  He stated that he became unable to work on January 26, 2007, but that he stopped working on June 2, 2007.  (Tr. 168, 232.)  He stated that he previously worked as a salesman, welding machine operator, grocery store worker, and customer service representative.  (Tr. 233.)  He listed his highest grade of school completed as the tenth grade, and reported that he had no further special training or educational classes.  (Tr. 240.)

On August 29, 2006, plaintiff injured his back while working at Lowes hardware store.  He was attempting to lower a vanity, which weighed approximately 100 to 150 pounds, when he felt neck pain and discomfort. (Tr. 575.)  He received conservative treatment for his back and neck pain until an MRI revealed a herniated disk as the C6-C7 level.  (Tr. 316, 575.)

On January 26, 2007, plaintiff underwent his first surgery, a microdiscetomy.  (Tr. 464-68.)  The surgery significantly reduced neck and left arm complaints. Shortly after surgery plaintiff began feeling right-sided neck pain and discomfort in his right shoulder.  (Tr. 575.)

On January 27, 2007, plaintiff saw R. Blaine Rawson, M.D., after having a seizure.  He was in a chair when he felt lightheaded and then became unconscious for half a minute with tonic clonic movements.[2]  A motor exam afterwards revealed normal muscle strength, bulk, and tone. Sensation and reflexes exams were normal.  (Tr. 463.)

---

[2]Tonic is a state of continuous unremitting action, denoting especially a prolonged muscular contraction. Stedman's Medical Dictionary at 1998 (28th ed. 2006).
    Clonic is a form of movement of movement marked by contractions and relaxations of the a muscle, occurring with rapid succession and some seizure disorders. Stedman's at 392-93.

In January 2007, Dr. Rawson wrote a return-to-work letter stating that plaintiff could return to light duty work beginning June 18, 2007, but that plaintiff would be limited to lifting up to 50 pounds. (Tr. 769.)

On February 13, 2007, plaintiff was seen by Dr. Rawson. Plaintiff was two weeks post surgery and was doing well. Plaintiff still wore his cervical collar throughout the day, but was not required to. Dr. Rawson planned to provide a return-to-work form on March 19, 2007. (Tr. 326.)

Plaintiff told Dr. Rawson his symptoms improved after surgery but that he still experienced pain. Despite the pain, he returned to work full-time, working eight to nine hour shifts. (Tr. 330-32.) On March 29, 2007, plaintiff told Dr. Rawson that he had borrowed his neighbor's tractor. An MRI revealed slight degenerative changes at L5-S1 discs with slight retrolisthesis of L5 on S1. (Tr. 329.)

On April 26, 2007, plaintiff saw Dr. Rawson and complained of pain when looking upward or when lifting certain objects over his head. Dr. Rawson recommended a continued lifting restriction of 40 pounds and no overhead lifting. (Tr. 333.) On May 31, plaintiff saw Dr. Rawson again. Dr. Rawson noted progress with flexibility, strength, and physical therapy. (Tr. 337.)

On May 14, 2007, plaintiff attended Northsport Physical Therapy for an initial appointment with Physical Therapist David Montgomery. Montgomery assessed that plaintiff still experienced neck pain four months following surgery with a weakness in his neck muscles. Plaintiff's grip strength was 110 pounds in both hands. (Tr. 395.)

On June 26, 2007, plaintiff saw Dr. Rawson. Plaintiff had returned to work but complained of low back pain. He had also started to experience numbness in his left hand on the last three digits. (Tr. 339.)

On July 24, 2007, plaintiff visited Dr. Rawson. He reported some back and leg pain and continued numbness in third and fourth digits on his left hand. Dr. Rawson recommended an MRI of the cervical spine. (Tr. 342.)

In July 2007, plaintiff had an MRI, which revealed a posterior disc osteophyte complex which caused moderate right foraminal narrowing and effacement of the anterior thecal sac.[3]  (Tr. 760-61.)

Three times from May 18, 2006 to August 15, 2007, plaintiff saw Emilio Gatti, M.D., for seizures.  No other problems were reported.  (Tr. 284-89.)

On August 15, 2007, plaintiff saw Steve Parker, M.D., for his seizure condition.  Dr. Parker did a full body physical, and found normal motor strength with normal muscle mass, tone, and normal sensation.  (Tr. 282.)

On September 5, 2007, plaintiff underwent his second surgery, a right C6-7 foraminotomy.  Plaintiff reported that he did not return to work after the second surgery.  (Tr. 456-61, 575.)  Plaintiff also saw Dr. Rawson that day.  Dr. Rawson noted that plaintiff had normal muscle strength, sensation, and reflexes.  Dr. Rawson noted right sided C7 radiculopathy, seizure disorder, and asthma.[4]  (Tr. 349, 457.)

On November 14, 2007, plaintiff visited Paul Tolentino, M.D., and Jason Bowers, PA-C, for evaluation and treatment of neck pain on a worker's compensation claim.  Plaintiff complained of pain and discomfort in the posterior neck and low back discomfort.  He stated there was no detriment in motor, sensory, gait, or station, and that sitting decreases his symptoms.  He had not done any physical therapy after his second surgery.  (Tr. 621-25.)

On November 30, 2007, plaintiff visited Annamaria Guidos, M.D.  Plaintiff complained of numbness and tingling in the last three digits of his left hand and recent discomfort on the medial epicondylar region of the left elbow.  Dr. Guido's impression was left ulnar neuropathy across the elbow with chronic reinnervation and borderline or mild carpal

---

[3]Osteophyte is a bony growth outgrowth. Stedman's at 1391.
Foraminal is a perforation through a bone or membranous structure. Stedman's at 756.
Effacement is a thinning out of the cervix.  Stedman's at 613.

[4]Radiculopathy is a disorder of the spinal nerve roots.  Stedman's at 1622.

tunnel syndrome without evidence of significant acute denervation or chronic reinnervation.[5] (Tr. 626-27.)

On December 17, 2007, plaintiff saw Dr. Tolentino and Jason Bowers. Plaintiff complained of neck pain and numbness in left lateral three digits. Dr. Tolentino examined a myelogram of the cervical spine from December 6, 2007, which revealed normal cervical lordosis, good intervertebral disk height at the C2-3, C3-4, C4-5, and C5-6 levels, with evidence of an anterior discectomy and fusion at the C6-7. There were also partial facetectomy and a mild narrowing of the bilateral foramina at the C6-7, worse on the right than the left[6]. Dr. Tolentino prescribed Ultracet and Skelaxin, occupational therapy for plaintiff's ulnar neuropathy and cervicalgia, elbow padding for the left elbow, and ordered flexion and extension x-rays of plaintiff's cervical spine.[7] (Tr. 618-20.)

From January 8 to 28, 2008, plaintiff saw Dr. Tolentino several times. Plaintiff complained of pain when turning his head, backing up, and a stabbing pain. The pain could last for up to a week. His grip strength was between 88 pounds in the left hand, 92 pounds in the right hand, and 80 pounds for both hands. (Tr. 480-513.)

---

[5]Ulnar is the medial and larger of the two bones of the forearm. Stedman's at 2063.

Neuropathy is a disorder affecting the nervous system. Stedman's at 1313.

Reinnervation is the reestablishment of neural control of a formerly paralyzed muscle by means of regrowth of nerve fibers. Stedman's at 1669.

Carpal tunnel is the compression of the median nerve. Stedman's at 2055.

Denervation is a loss of nerve supply. Stedman's at 509.

[6]Facetectomy is an excision of a small smooth area on a bone or other firm surface usually covered with articular cartilage. Stedman's at 690-91.

[7]Ultracet a medicine for treating moderate to moderately severe sever pain. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

Skelaxin a medicine for treating muscle spasms and pain. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

Cervicalgia relates to the cervix, or neck. Stedman's at 351.

On January 30, 2008, plaintiff saw Dr. Guidos. Dr. Guidos discontinued physical therapy. Dr. Guidos continued limitations of maximum lifting of 20 pounds, no overhead lifting, no overhead work, and limiting flexion and extension of the cervical spine. Plaintiff had normal strength in all major muscle groups, and bulk and tone were symmetrical. He also had normal reflexes and sensation, except for his left hand's last two digits. He was independent in activities of daily living, mobility, transfer, and could easily lift 20 pounds to his waist. Dr. Guidos hoped to further decrease restrictions as time continued. (Tr. 599-600, 636-39.)

On February 2, 2008, plaintiff saw Physical Therapist Kirt Burger. Plaintiff continued to have headaches and pain in his neck, with the pain increasing with cervical movements. He had above 100 pounds of grip strength. (Tr. 562.)

On February 18, 2008, plaintiff again saw Dr. Guidos. Plaintiff reported doing more work around the house, becoming more active, but also noticed an increase in discomfort in the cervical region. He reported pain at the site of the surgery. He discussed work conditioning with Dr. Guidos and specific restrictions for physical therapy. (Tr. 634-35.)

On February 25, 2008, plaintiff saw therapist Burger. Burger noted neck pain, headaches, and a decreased functional status for plaintiff. Plaintiff had normal sensations, reflexes, and a grip strength of more than 100 pounds in both hands. (Tr. 562.)

On February 26, 2008, plaintiff saw Dr. Guidos with complaints of ongoing discomfort in the cervical spine. He had normal strength in all major muscle groups, and bulk and tone were symmetrical. He also had normal reflexes and sensation. He expressed a desire to return to Michigan to work, which Dr. Guidos advised against because of possible future surgery. (Tr. 595-96, 632-33.)

On March 3, 2008, plaintiff saw Dr. Tolentino and Patrick Hammond for neck pain and numbness in his left ulnar three digits. Plaintiff had been undergoing non-surgical management with physiatry[8] and having

_____

[8]Physiatry is the branch of medicine that treats injuries or illnesses that affect movement.

(continued...)

inconsistent improvement to manage his pain and discomfort. He had normal strength in all major muscle groups, and bulk and tone were symmetrical. He also had normal reflexes and sensation, except for his left three digits. Dr. Tolentino found no evidence of gross instability, but did find substantial cervicalgia, which could severely limit plaintiff. A CT scan suggested lucency in the C6-7 space, which could reflect a partial non-union. Dr. Tolentino recommended a continuation of the same treatment, to keep off work until the physiatry can reassess, and another C6-7 surgery as a last resort. (Tr. 575-77, 612-14.)

On March 24, 2008, plaintiff visited Dr. Guidos, M.D. Plaintiff stated that there are days where he felt somewhat better but overall felt the same. After discussing physical therapy, Dr. Guidos called the physical therapist and decided that physical therapy would not help his pain. Plaintiff also decided against another surgery to try and minimize the pain. (Tr. 593-4, 630-31.)

On April 21, 2008, Physical Therapist Matt Rubel conducted a functional capacity evaluation of plaintiff to determine his physical limitations. (Tr. 522-36.) He had normal strength and sensation testing. Rubel determined that plaintiff could function normally except that he a 20 pound lifting restriction with no over head work and limited flexion and extension of his cervical spine. (Tr. 529.) Mr. Rubel noted that plaintiff was able to work up to the 20 pound restriction, but his pain level and symptoms gradually worsened as the evaluation progressed. (Tr. 523.)

On April 28, 2008, plaintiff saw Dr. Guidos to a follow-up visit. Plaintiff stated he still had significant discomfort in the cervical spine region but was reluctant to proceed with any further surgeries. Due to plaintiff's symptoms, Dr. Guidos recommended waiting on a release to work. Dr. Guidos noted that when released, plaintiff would likely have restrictions that were consistent with functional capacity evaluation. Dr. Guidos then referred plaintiff to Dr. Cleaver for pain management. (Tr. 628-29.)

---

[8](...continued)
See http://www.aapmr.org/patients/aboutpmr/pages/physiatrist.aspx (Last viewed on August 22, 2012).

On May 5, 2008, plaintiff visited Dr. Guidos. Plaintiff complained of neck pain. Dr. Guidos noted persistent neck pain in the presence of previous cervical decompression and fusion and likely secondary myofascial pain, enesthopathy[9] of the cervical spine with occipital neuralgia and muscle contraction type headaches. Plaintiff had good grip and intrinsic muscle strength in both hands. (Tr. 572-74.)

On May 8, 2008, plaintiff saw Dr. Cleaver, complaining of neck pain. Dr. Cleaver noted persistent neck pain in the presence of previous cervical decompression and fusion, and potential non-union present without cervical radiculopathy. Dr. Cleaver also noted likely secondary myofscial pain, enesthopathy of the cervical spine with occipital neuralgia, and muscle contraction type headaches. He recommended increasing the Lyrica dosage for better treatment of fibromyositis and myofascial symptoms, but first wanted a neurologist to evaluate plaintiff for assistance in light of his seizure disorder.[10] He also stated that plaintiff would benefit from intramuscluar injection of the areas of maximal tenderness and bilateral occipital nerve blocks for treatment of his muscle contraction type headache. (Tr. 643-45.)

On May 23, 2008, plaintiff completed a Function Report. His medical conditions reported were fusion on his neck, "ground spurs" that were hitting nerves, and degenerative disc disease. Plaintiff described the symptoms that kept him from working as pain and fatigue in his neck, weakness in his low back and legs, and numbness in his left leg. (Tr. 253-60.)

On May 26, 2008, plaintiff saw Dr. Cleaver for low and right sided back pain. He also reported intermittent numbness and tingling along his left leg. However, more problematically, he recently had symptoms along

_____

[9] A disease occurring where muscle tendons and ligaments attach to bones or joint capsules.
See http://medical-dictionary.thefreedictionary.com/enthesopathy (Last visited on August 22, 2012).

[10] Lyrica a medicine for treating pain cause by nerve damage due to diabetes or to treat pain in people with fibromyalgia. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

the right posterior lateral thigh and calf. His reflexes, sensation, and muscle strength were all normal. (Tr. 704-05.)

On May 27, 2008, plaintiff visited Dr. Cleaver for a trigger point injection. Dr. Cleaver again recommended occipital nerve block for treatment of muscle contraction type headache and a repeat of the trigger injection for continued relief. (Tr. 642.)

On June 11, 2008, plaintiff saw Dr. Cleaver for a trigger point injection. Plaintiff stated the first injection definitely improved his condition, along with Lyrica. (Tr. 641.)

On June 30, 2008, plaintiff saw Mel Moore, M.D., who performed a physical residual functional capacity assessment. Plaintiff alleged that he had problems pushing, pulling, or lifting more than 20 pounds; could not do overhead work; had trouble squatting or bending; and pain in his neck and shoulders. Dr. Moore assessed that plaintiff retained the capability of performing work at the light exertion level, but with some postural, manipulative, and environmental limitations. His lumbar spine was essentially normal except for stiffness. An exam of plaintiff's low back and legs was not remarkable. No overhead work was recommended and plaintiff had limited back flexion and extension. A visit on May 8, 2008, revealed significant tenderness in his neck and shoulder muscles, and significant tenderness over the exit of the occipital nerve on both sides. He also had a decreased sensation to touch. (Tr. 604-09.) Dr. Moore found plaintiff's allegations only "partially credible." (Tr. 608.)

On July 15, 2008, plaintiff visited Dr. Cleaver, complaining that his pain had worsened since discontinuing Flexeril and starting Tramadol.[11] Dr. Cleaver recommended discontinuing Ultracet, prescribed Amrix, and continued nonsteroidals for pain control.[12] He also recommended a neurological evaluation for assistance with medical

_____

[11]Flexeril a medicine for is used short term to treat muscle spasms. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).
Tramadol a medicine for relieving moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

[12]Amrix a medicine for treating muscle spasms. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

- 9 -

management and a cervical epidural steroid injection for cervicalgia, to be completed after the evaluation by the neurologist.  (Tr. 639-41.)

On September 6, 2008, plaintiff had a heart attack and underwent surgery for the placement of a stent.  (Tr. 646-52, 820, 822.)  The severity of the heart condition was mild to moderate.  (Tr. 871, 875.) On September 8, 2008, plaintiff was discharged from the hospital.  He was also diagnosed with diabetes.  (Tr. 653-59.)

On September 22, 2008, plaintiff saw Dr. Steven Mellies, a neurologist.  Dr. Mellies noted that plaintiff had persistent neck pain and no signs of cervical spine or radiculopathy.  He had good strength in both legs, no focal weakness in arms or hands, and his reflexes appeared normal in his arms.  Dr. Mellies scheduled an EEG. (Tr. 669-70.)

On September 26, 2008, plaintiff underwent an EEG.  The impression was a normal electroencephalogram recorded during wakefulness and drowsiness.  (Tr. 671.)

On October 6, 2008, plaintiff visited We Wen, M.D., about his diabetes.  They discussed how dieting could help him control his diabetic symptoms.  (Tr. 665-66.)

On October 15, 2008, plaintiff followed-up with Gabriel Soto, M.D. Plaintiff complained of fatigue and dyspnea but said that his symptoms were gradually improving.  He was instructed to continue with Dr. Wu Wen. (Tr. 660-65.)

On December 16, 2008, plaintiff saw Michael Critchlow, M.D.  He had a reoccurring problem of nosebleeds for several weeks.  He had nausea and the doctor told him to lower his Metformin dosage.[13]  He also had palpitations when taking care of horses, and did no heavy lifting because of pain in his neck and back.  (Tr. 696.)

On December 19, 2008, plaintiff visited Mike Brown, M.D., for sinus problems.  He reported intermittent nosebleeds for eighteen months, pain at the base of the skull, and blurred vision.  (Tr. 695.)

From December 17, 2007 to July 15, 2008, plaintiff received twelve work readiness slips from the Brain & Neurospine Clinic of Missouri.  Ten

---

[13]Metformin is a medicine for controlling high blood sugar in people with type 2 diabetes.  WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

of the slips stated that he could not return to work; two of the slips stated that he could work but with restrictions of no overhead lifting or work, maximum lifting of 20 pounds, and limitations on the flexion and extension of his cervical spine. (Tr. 774-85.)

On January 19, 2009, plaintiff followed-up with Dr. Wen. He had been unable to exercise or endure significant exertion. (Tr. 667-68.)

On March 4, 2009, plaintiff visited Dr. Soto for a follow-up regarding his coronary disease. He reported continued problems with fatigue, ongoing back and cervical spine problems, and heart burn. (Tr. 678-79, 836.)

On May 26, 2009, plaintiff saw Dr. Cleaver. He complained of spine pain with extension and rotation 15 to 30 degrees. Dr. Cleaver noted that plaintiff had degenerative disc disease in the lumbar spine with lumbar spinal stenosis and possible L4-5 lumbar radicular pain right side greater than left lower leg.[14] (Tr. 705-6.)

Plaintiff told Dr. Parker that as of May 2006, he had not had a seizure with the loss of consciousness since the age of seven. (Tr. 290.) He had a seizure after his first surgery in January 2007. (Tr. 456.) He has not had a seizure since September 2007 after the second back surgery. He is taking Depakote which controls his seizures.[15] (Tr. 290.)

On May 27, 2009, plaintiff had nasal surgery. The surgery went well and he responded well to treatment. (Tr. 828-30.)

From May 9, 2009 to October 30, 2009, plaintiff saw Dr. Wen three times for his diabetes. Plaintiff had weight loss and gain, neck and back pain, fatigue, weakness, dizziness, and balance issues. (Tr. 790-97.)

On June 12, 2009, plaintiff saw Dr. Critchlow. He had unexpected weight loss, problems sleeping, weak spells, and exhaustion. (Tr. 843.)

On August 14, 2009, plaintiff followed-up with Dr. Critchlow. He complained of crying spells, feelings of hopelessness, and trouble

_____

[14]Stenosis is a stricture of any canal or orifice. Stedman's at 1832.

[15]Depakote is a medicine for treating seizure disorders. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

sleeping.  Dr. Critchlow noted that he was having major depression, ischemic heart disease, diabetes mellitus, and dysuria.[16]  Dr. Critchlow prescribed Flomax for depression and Ambien to help him sleep.[17]  (Tr. 840.)

On August 2, 2009, plaintiff saw Mark Hahn, D.O.  (Tr. 803-05.)  He complained of depression.  His extremities appeared normal.  (Tr. 804.)

On January 7, 2010, plaintiff filled out a claimant's medical treatment form.  He described his conditions as nerve damage, fibromyalgia, emosthopahty, surgery at C6-7, skull pain, neck pain, headaches, low back pain, degenerative disc disease, heart disease, diabetes, and depression.  (Tr. 272-77.)

On March 1, 2010, plaintiff saw Physical Therapist Patrick Hammond, and complained of neck, shoulder, and low back pain, with the pain being greater on the right side of the shoulder and low back.  The motor functions of his upper and lower extremities showed normal strength in all muscle groups and his muscle bulk and tone were symmetrical and normal.  His neck movements were normal except extension, R-rotation, and L-rotation were limited.  Hammond noted cervical spondylosis with right sided neck and shoulder pain.[18]  Hammond recommended a CT scan and flexion and extension x-rays to evaluate plaintiff's fusion, an MRI of his right shoulder to evaluate for primary shoulder pathology, and an EMG nerve conduction study to evaluate cervical radiculopathy.  (Tr. 849-54.)

On March 22, 2010, plaintiff saw Dr. Guidos complaining of neck, right shoulder, and right low back pain.  He also complained of numbness and tingling in last two digits on left hand.  A physical exam revealed that plaintiff's upper extremities showed normal strength in all major muscle groups, and that his muscle bulk, tone, sensation, and reflexes

---

[16]Ischemic is the local loss of blood supply due to mechanical obstruction of the blood vessel.  Stedman's at 1001.
Dysuria is difficulty or pain in urination.  Stedman's at 604.

[17]Flomax is a medicine for treat the symptoms of enlarged prostate. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

[18]Spondylosis is lesion of the spine of a degenerative nature. Stedman's at 1813.

were normal.  Dr. Guidos' impression was that the symptoms were consistent with mild bilateral carpal tunnel syndrome with acute denervation and chronic reinnervation.  Dr. Guido's noted left ulnar neuropathy across the elbow without evidence of acute denervation or chronic reinnervation and mild impingement of bilateral ulnar sensory nerves of the wrist.  There was no evidence of acute cervical radiculopathy.  The exam also showed that plaintiff's upper extremities were normal in motor function, sensation, and reflexes.  (Tr. 857-60.)

On March 22, 2010, plaintiff underwent an MRI of his right shoulder by David Croyle, M.D.  The MRI revealed minimal and mild supraspinatus tendonopathy, lateral down sloping of the acromion impinging on the supraspinatus tendon, mild AC joint osteoarthritis, minimal subdeltoid bursitis, and no fracture, malignancy, or labral tear.  (Tr. 855-56.)

On the same day, plaintiff underwent upright and lateral views of his spine flexion and extension by Dr. Brown.  He noted good healing, good maintenance of disc space height, normal alignment, and intact hardware at C6-7 fusion site. (Tr. 861.)

Plaintiff also underwent the scheduled CT of the cervical spine by Dr. Brown.  Dr. Brown noted mild degenerative disc space narrowing at C5-6, some asymmetric hypertrophy on the right more than the left, which produced some mild neutral foraminal narrowing.  The left neural foramen appeared to be adequate and spinal canal dimensions were within normal limits.  (Tr. 862-63.)

On March 23, 2010, plaintiff saw Dr. Guidos for an electromyography (EMG) nerve conduction study.  The test showed mild bilateral carpal tunnel syndrome with acute denervation and chronic reinnervation, left ulnar neuropathy across the elbow without evidence of acute denervation or chronic reinnervation, and mild impingement of bilateral ulnar sensory nerves at the wrist level.  Plaintiff's upper extremity strength was normal for all major muscle groups, and sensory and reflex exams of the upper extremities revealed were normal.  (Tr. 858-59.)

On March 29, 2010, plaintiff visited Dr. Jason Bowers with complaints of neck, shoulder pain with the right side pain being greater, and low back pain.  Plaintiff also reported numbness-type sensation in last three digits of his left hand and occasional nocturnal paresthesias.

He had full range of cervical motion except flexion and extension were limited due to fusion, and bilateral rotation was limited. His upper and lower extremities showed normal strength in all muscle groups and his muscle bulk, tone, sensation, and reflexes were symmetrical and normal. Dr. Bowers initiated a consultation with an orthopedic surgeon for the right shoulder bilateral C6-7 facet blocks. Plaintiff agreed with the plan of care. (Tr. 864-68.)

**Evidence Presented to Appeals Council**

On April 29, 2010, plaintiff saw Andrew C. Trueblood, M.D., for an exam of his right shoulder. Dr. Trueblood described plaintiff as "[w]ell nourished, well-appearing . . . [a]pproximately [his] stated age, [in] no acute distress." "He has full ROM to 170 degrees of forward elevation and internally rotates to his mid-thoracic spine; externally rotates to 90 degrees at 90 degrees of abduction." Dr. Trueblood diagnosed "mild R shoulder impingement syndrome with his prominent symptoms coming, most likely, from compensatory firing of his scapula stabilizing musculature. I recommend a course of PT. I don't think that he would benefit from an MR at this point as he has no frank weakness and his symptoms are relatively mild." (Tr. 923-24.)

On June 4, 2010, plaintiff again saw Dr. Trueblood. Dr. Trueblood recommended continued physical therapy and anti-inflammatories. (Tr. 925.)

On August 3, 2010, plaintiff saw Crystal Hammond-Morrow, Ed.S, for counseling to treat his depression after a breakdown and visit to a family physician. Plaintiff reported that one year ago he had a break down when he was evicted by his family from his aunt's home upon her death, which he thought he would inherit. He was diagnosed with a major depressive episode, recurrent, moderate, and a mood disorder due to his general medical condition. (Tr. 909-13.)

On August 19, 2010, plaintiff saw Dr. Critchlow and informed him that he was seeking disability. Dr. Critchlow commented that it is not his usual routine to state whether or not patients are disabled. Nevertheless, he include in his response that it is probably true that plaintiff is disabled. (Tr. 901.)

On August 23, 2010, Dr. Critchlow wrote a letter to Ms. Heckemeyer informing her that he believed that plaintiff was disabled. He stated that plaintiff suffered from coronary artery disease, myocardial infarction, diabetes, chronic pain in his neck and low back, and depression. (Tr. 900.)

On September 20, 2010, Dr. Michael Critchlow again wrote a letter stating that plaintiff had various medical problems which made it impossible for him to be gainfully employed. (Tr. 906.)

**Testimony at the Hearing**

On April 7, 2010, the plaintiff testified to the following at a hearing before the ALJ. (Tr. 39-82.)

Plaintiff completed the tenth grade in high school, and has no GED or vocational training. He worked at Lowes hardware store from 2004 to August 2007 when he left due to his back injury. He had surgery after his injury and attempted to return to work. (Tr. 42.)

Prior to working at Lowes, plaintiff worked as a grocery store employee, a welding machine operator, and a salesman. He was required to lift a variety of objects at these jobs ranging from 35 to 100 pounds. (Tr. 43-45.)

Plaintiff is currently married and living in an apartment with his wife. He drives approximately three times a week, either to Wal-Mart or his cousin's house to take care of his dog. His hobby is wood working, making objects like bird houses, which he previously did a few times a week. But within the past two months he has not done any of this. (Tr. 46.) He attends church but has trouble sitting for longer than twenty minutes. (Tr. 45-47.)

Plaintiff is taking Flexeril, Motrin, Advil, and Metformin.[19] The medications cause dizziness and blurred vision. The doctors do not know the precise cause of his dizziness and blurred vision but assume it is the medication. (Tr. 48-47.)

---

[19]Motrin is a medicine which is used to relieve various types of pain. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).
    Advil is a medicine which used to relieve different types of pain. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

Plaintiff will pace, stand, and sit during a typical day.  He gets up to eat and makes his own breakfast around 7:00 a.m.  (Tr. 49.)  He then watches TV for around an hour and paces.  Afterwards he might go to his cousin's house and return to the apartment.  He cooks approximately twice a week and goes shopping twice a month.  He does not have trouble grocery shopping but does not go as often as he used to.  While at the store, the most he usually lifts is 10 pounds.  (Tr. 50.)  He used to do the laundry but now rarely does.  He never vacuums, cleans the house, or takes care of the yard.  He washes himself but must use one arm instead of two when washing his hair.  (Tr. 51.)

When plaintiff was first injured, it felt like his neck was burning on the right side.  His left thumb and three fingers would go numb, and he had problems with his low back.  (Tr. 52.)

Plaintiff's first surgery did not help him, but he returned to work after two months.  He worked approximately a month before the pain returned again and he had the second surgery.  He did not return to work after the second surgery.  (Tr. 52-53.)

After the second surgery it felt like there was a sharp pain in his neck.  It went into the base of his skull and then into his right shoulder.  If he does a lot of walking, sitting, or other movement, his low back flares up.  The doctors have recommended waiting four or five years before another back surgery to see how bad it gets.  He is having some symptoms of neuropathy in his left elbow which have been occurring for a year and a half.  (Tr. 53-54.)

Plaintiff is taking Deplin for depression.[20]  He occasionally gets badly depressed.  He breaks down "quite a bit, cr[ying] a lot, fe[eling] like dying."  The medication originally helped but since then problems have started again.  He also takes Ambien for sleep problems.[21]  (Tr. 54.)

Plaintiff believes that lifting no more than 20 pounds and no overhead lifting or extension of the lumbar spine is an accurate

---

[20]Deplin is a man made form of folate, a B-vitamin found naturally in some foods.  WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

[21]Ambien is a medicine which treats sleep problems in adults.  WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

reflection of his physical ability. If he repeatedly moves his arms or bends over, his neck will flare up. (Tr. 55.)

Plaintiff had no heart problems until his heart attack. He suffers from fatigue due to his heart condition. He quickly gets short of breath, cannot use an exercise bike, or go for long walks. He can walk for about 10 to 15 minutes before triggering cardiovascular symptoms. He currently takes nitroglycerin for his heart condition. (Tr. 57-59.)

Plaintiff currently has diabetes. He takes medication while dieting and exercises to control it. Diabetes interferes with his energy level, leaving him drained. His blood sugar also reacts to pain – when he feels pain his blood sugar goes up. (Tr. 60-61.)

Plaintiff gets blurred vision and dizziness, but does not know if his diabetes is the cause. He gets dizzy twice a day and must sit down or lean against something until the dizzyness. He takes Metformin for his dizziness. (Tr. 61-62.)

Plaintiff continues to suffer a constant daily pain from his surgeries. (Tr. 63.) He cannot take Vicodin as prescribed for the pain because it makes him sick.[22] (Tr. 64.) Damp days and driving make the pain in his spine flare up. (Tr. 65.)

Plaintiff has received two injections for his back pain. (Tr. 66.) Those injections were not beneficial and a neurosurgeon has not recommended surgery at this time. (Tr. 67.)

Plaintiff cannot work as a Lowes employee anymore. The repetitive moving, walking, squatting, and reaching cause his low back pain to flare up. He testified that he can not return to any of his other former jobs. (Tr. 70-72.)

Vocational Expert (VE) Jeffrey F. McGrowski, Ph.D., testified to the following. (Tr. 75-82.) The ALJ first asked the VE to describe and identify the jobs plaintiff had performed. The ALJ then asked the VE whether a hypothetical individual of plaintiff's age, education, and work experience, who could perform light work with occasional climbing of stairs and ramps; no ladders, ropes, or scaffolds; occasional balancing

---

[22]Vicodin is a medication used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (Last visited on July 11, 2012).

and stooping; no kneeling, crouching, crawling, or over head reaching; avoiding moderate concentrations of cold, heat, wetness, and humidity; avoiding moderate concentration to irritants such as fumes, odors, dusts, and gasses; avoiding unprotected heights and moving machinery; could perform plaintiff's past work. The VE testified the hypothetical individual could perform sales work at the light level or cashiering work. (Tr. 76-77.)

The ALJ then asked if there was any unskilled work at the light level for the same hypothetical individual. The VE described work three jobs the hypothetical individual could perform: usher, furniture rental consultant, and children's attendant. (Tr. 78.)

The ALJ then asked a third hypothetical question: If all the same limitations were kept but the VE also considered only sedentary work, would there be available work. The VE responded that the hypothetical individual could perform the job of customer service [representative], customer complaint clerk, information clerk, and telephone sales. The ALJ then inquired specifically about unskilled work. The VE stated that surveillance system monitor and callout operator would both be unskilled jobs that the hypothetical individual could perform. (Tr. 78-79.)

### III. DECISION OF THE ALJ

On June 18, 2010, the ALJ entered a written decision concluding that plaintiff was not disabled under the Act. (Tr. 21-30.) At Step One,[23] the ALJ found that plaintiff had not engaged in substantial gainful activity since January 26, 2007. While it appeared plaintiff attempted to return to work, he completely stopped after his second surgery in September 2007. The work attempt was therefore classified as an unsuccessful work attempt. (Tr. 23.)

At Step Two, the ALJ found that plaintiff had severe impairments of status post diskectomy, fusion at the C6-C7 level, coronary artery disease with stent placement, degenerative disc disease of the lumbar spine with stenosis, depression, and seizure disorder. (Tr. 23.)

---

[23]See below for a description of the required five-step regulatory decisionmaking framework.

Plaintiff also alleged bilateral carpal tunnel syndrome but the ALJ found this is not severe because plaintiff did not allege any impairment or limitations from this condition. (Tr. 23-24.)

At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments under 20 CFR 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). The ALJ found that plaintiff's mental impairment does not meet or medically equal the criteria of Listing § 12.04. because as to "paragraph B", he did not have two marked limitations or one extreme limitation and plaintiff's mental impairment is a mild limitation in activities of daily living and social functioning and is a moderate limitations in concentration, persistence, or pace; nor did plaintiff satisfy criteria in "paragraph C" for depression or anxiety. (Tr. 24.)

The ALJ then found that plaintiff has the RFC to perform unskilled light work, except that plaintiff can only occasionally climb stairs, balance and stoop; do no climbing of ladders, kneeling, crouching or crawling; do no overhead reaching; he must avoid concentrated cold, heat, wetness, humidity, moving machinery, and unprotected heights; and he must avoid moderate exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas. (Tr. 24-25.)

The ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that his statements concerning the intensity, duration, and limiting effects of these symptoms were not entirely credible. (Tr. 25.)

To determine credibility, the ALJ first looked at plaintiff's injury and subsequent surgeries. Plaintiff had an MRI which revealed slight degenerative change at L5-S1, but no disc herniation or significant central canal stenosis.

Regarding treatment, the ALJ noted that the surgery suggests that the symptoms plaintiff complained of were genuine, but also noted that the surgeries were generally successful in relieving the symptoms. The ALJ also explained that plaintiff attempted to return to work, borrowed his neighbor's tractor, underwent physical therapy to reduce pain, and took medication for his back pain. Weighing all the relevant factors,

the ALJ determined that plaintiff's subjective complaints did not warrant any additional limitations beyond those imposed in the RFC. (Tr. 26.)

The ALJ found plaintiff's allegation of total disability due to his back impairment not fully credible. The ALJ noted that Dr. Rawson allowed plaintiff to return to work with a limitation on lifting more than 50 pounds and no overhead lifting; and Matt Rubel found plaintiff capable of lifting 20 pounds with no overhead work, and limited movement of his cervical spine. The ALJ commented that no doctor had ever stated that plaintiff was capable of performing anything less than work at the light exertional level. (Tr. 27.)

The ALJ then looked at plaintiff's coronary artery disease. The severity was mild to moderate and treated with oral medication. Plaintiff alleged fatigue and shortness of breath, but the ALJ considered that plaintiff continues to pursue his wood working hobby, even if he does not spend as much time doing it as he would like. The ALJ found that plaintiff's condition limits his ability to perform some basic work activities, specifically avoiding "concentrated exposure" to cold, heat, wetness, humidity, exposure to fumes, odors, dust, and gases. (Tr. 27.)

The ALJ considered plaintiff's seizure disorder noting that plaintiff testified that his seizures are controlled by medication. (Id.)

The ALJ noted that plaintiff was also treated for depression, but he was prescribed medication that controls his symptoms and he had never sought treatment from a specialist. (Tr. 28.)

After determining that plaintiff is subject to a mental impairment, the ALJ discussed the "B" criteria. The ALJ determined that plaintiff has mild restrictions in his daily living. While he described his activities as fairly limited, the ALJ considered two factors that weighed against him. First, the allegedly limited daily activities could not be objectively verified. Second, the ALJ reasoned it is difficult to determine what degree of plaintiff's limitations are due to his medical condition, in light of the relatively weak medical evidence. Overall, the ALJ determined that plaintiff's reported daily activities did show limitations, but that other factors were more compelling in the ALJ's determination. (Tr. 28)

The ALJ concluded that plaintiff had mild limitations in his social functioning, explaining that plaintiff testified that he does not have problems interacting with others and does not like to be alone. The ALJ determined this was a mild limitation. (Tr. 28.)

The ALJ found that plaintiff had moderate deficiencies in concentration, persistence, or pace, based on his testimony, but he had no episodes of decompensation. The ALJ found that the mental impairment is severe and required a reduction in the RFC to only unskilled work. (Tr. 28.)

Overall, the ALJ found that plaintiff's daily activities were normal and "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations that precludes him from all work activity." (Tr. 29.) The ALJ looked at plaintiff's work history, which included working eight to nine hour shifts, and that no doctor had ever recommended stopping work altogether. The ALJ concluded that plaintiff's work history does not support his statements about his inability to work due to disabling impairments. (Id.)

At Step Four, the ALJ found that plaintiff is unable to perform any past relevant work because it exceeds his RFC. (Id.)

At Step Five, the ALJ found plaintiff can perform other work that exists in significant numbers in the national and local economy, such as an usher, furniture rental consultant, and children's attendant. (Tr. 30.) Accordingly, the ALJ found that plaintiff is not disabled under the Act. (Id.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's final decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence

supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. <u>See</u> <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would result in either death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D). and (d)(1)(A); <u>Pate-Fires</u>, 564 F.3d 935, 942 (8th Cir. 2009).

A five-step regulatory framework is used to determine whether the claimant is disabled. 20 C.F.R. § 404.1520(a)(4); <u>see also</u> <u>Bowen v.</u> <u>Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing the five-step process); <u>Pate-Fires</u>, 564 F.3d at 942 (same). Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his impairment is or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. <u>Id.</u> Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). <u>Id.</u> The claimant bears the burden of demonstrating he is no longer able to return to him PRW. <u>Id.</u> If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work in significant numbers in the national economy. <u>Id.</u>

## V. DISCUSSION

Plaintiff argues that the ALJ erred in (1) finding that his neuropathy was not a severe impairment; (2) not making a determination of whether or not his physical condition met a listed impairment equalling a disability; (3) not finding that his spinal condition met the criteria for disability at Step Three of sequential process; (4) determining his RFC by misconstruing the evidence, because the Appeals Council did not fully credit the new evidence contained in the record, and because the

Appeals Council failed to complete the required psychiatric review analysis; and (5) failing to demonstrate that there are significant numbers of jobs that he can perform.

## A. Plaintiff's Neuropathy

Plaintiff argues that the ALJ erred in finding that his neuropathy was not a severe impairment.

When determining if an impairment is severe, the ALJ must consider that a "nonsevere" impairment has "'no more than a minimal effect' on the ability to work." Johnston v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000).

The claimant bears the burden of proving his impairment or combination of impairments is severe. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). Although, "severity is not an onerous requirement for the claimant to meet, ... it is also not a toothless standard." Id. at 708.

A failure by the ALJ at Step Two to include an impairment that is severe warrants a reversal and remand. See Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir.2007) (holding that an error in failing to treat claimant's borderline intellectual functioning as a severe impairment at Step Two was not harmless error).

At Step Two, the ALJ determined that plaintiff did not suffer from the severe impairment of carpal tunnel syndrome. The ALJ concluded that, as to plaintiff's carpal tunnel condition, the medical evidence establishes only a minimal, if any limitation, on plaintiff's ability to work.

The ALJ's conclusion that plaintiff's alleged neuropathy was not severe is supported by substantial evidence. Plaintiff did not allege any limitations in his April 21, 2008, functional capacity report, which was made after he had been diagnosed by Dr. Tolentino with carpal tunnel syndrome. (Tr. 523-29, 864.) In his testimony before the ALJ, plaintiff was asked about his neuropathy. He responded only that he has some in his "left arm, the elbow" for a year and a half. (Tr. 54.) When questioned by his attorney about his limitations, plaintiff again did not mention any limitations from his carpal tunnel condition.

Plaintiff did, however, complain of numbness in his hands several times when visiting his clinic. (Tr. 857, 864.) But, at those same visits plaintiff did not complain of, nor did doctors note, any limitations from his numbness. Plaintiff was reported to have 5/5 strength in upper extremities for all major muscle groups. (Tr. 858, 866.) There were no reports of numbness leading to problems or limitations.

When plaintiff was diagnosed by Dr. Guidos with bilateral carpal tunnel syndrome and left ulnar neuropathy, Dr. Guidos did not make any comments or notes of limitations stemming from these conditions. Dr. Tolentino discussed treatment for plaintiff's back pain and recommended an evaluation for a possible right shoulder surgery. But Dr. Tolentino did not discuss any limitations stemming from plaintiff's neuropathy.

While the ALJ did not specifically address plaintiff's neuropathy, the same logic applies as it did to the carpal tunnel. The neuropathy was discovered by Dr. Tolentino, who did not regard the condition as needing treatment. Plaintiff alleged no limitations or restrictions from his neuropathy.

The ALJ specifically discussed why she did not consider the bilateral carpal tunnel syndrome a severe impairment. She acknowledged an EMG had discovered several conditions, but noted that plaintiff had not alleged any limitations or restrictions from these conditions. (Tr. 23-24.) Therefore, with no evidence of a limitation or restriction stemming from the  impairments, the ALJ concluded the impairments were not severe. See Martise v. Astrue, 641 F.3d 909, 924 (8th Cir. 2011) (holding that the ALJ's synopsis of medical records and discussion of alleged impairments showed that the ALJ considered the impairment and found the claimant not disabled).

Substantial evidence on the record supports the ALJ's finding that plaintiff's carpal tunnel condition and neuropathy were not severe impairments.

**B.  Step Three: Listing § 1.04(A)**

Plaintiff argues that the ALJ erred at Step Three by not making any determination of whether or not his physical severe impairments met the listed impairments.

Here the ALJ clearly stated that plaintiff did not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (Tr. 24.) While the ALJ does not explicitly walk through the steps of why she did not find that plaintiff met the requirements, there is no error if the "overall conclusion is supported by the record." Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

Plaintiff then argues that the ALJ erred in finding that he did not meet the requirements of the Listing § 1.04(A). To meet a listing of disability an "impairment must meet all of the listing's specified criteria." Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010). Plaintiff had the burden of proving that he met or equaled a listing. Id.

To meet Listing § 1.04(A), plaintiff must establish that he suffers from a spinal disorder (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in the compromise of a nerve root or the spinal cord, accompanied with evidence of (1) nerve root compression characterized by neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and (4) if there is involvement of the low back, positive straight-leg raising tests (sitting and supine). 20 C.F.R. Pt. 404, Subpt. P, App'x 1.

First, there is involvement of plaintiff's low back. Plaintiff complained of pain or discomfort in his low back several times. (Tr. 253-60, 272-77, 621-25, 704-05, 849-54, 857-60, 864-68.) When there is involvement of the low back, there must be "positive straight-leg testing (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App'x 1. The record here does not establish that plaintiff had both positive sitting and supine straight leg tests. The only leg exam on the record was from Dr. Moore who stated that the "exam of . . . [plaintiff's] legs was not remarkable." (Tr. 608); see King v. Astrue, 2:09-2358-RSC, 2010 WL 3430781, at *5 (D.S.C. Aug. 31, 2010) (holding that ALJ properly found the claimant did not meet Listing § 1.04(A) when there was not clear evidence of positive straight leg testing).

Second, there is no evidence of reflex or motor loss. Plaintiff had numerous doctor visits that described his reflexes and muscle strength, with all consistently reporting that his reflexes and motor skills were normal. (Tr. 284, 349, 457, 463, 529, 562, 573, 593, 596, 597-98, 600, 670, 705, 800, 804, 851, 858, 866, 895.)

Third, plaintiff consistently had no sensory loss. (Tr. 284, 349, 457, 463, 529, 562, 593, 596, 598, 600, 670, 705, 852, 858) There were two exceptions. Dr. Moore saw plaintiff once and noted decreased sensation. But Dr. Moore also described plaintiff's allegations as only "partially credible." (Tr. 608.) Dr. Guidos noted decreased sensation to light touch in one visit. (Tr. 573.) But none of plaintiff's other visits with Dr. Guidos revealed the same sensory loss.

Plaintiff does not meet all the requirements in Listing § 1.04(A); given the absence of positive straight leg testing, reflex loss, motor loss, and possible sensory loss. Therefore, the ALJ's conclusion was supported by substantial evidence on the record as a whole. See Boettcher.


## C. RFC Determination

Plaintiff argues that the ALJ erred in determining his RFC. He argues that the ALJ misconstrued the evidence, that the Appeals Council did not fully credit the new evidence in the record, and that the Appeal Council failed to make the appropriate psychiatric review analysis.

### 1. Physical RFC

Plaintiff argues that the ALJ's RFC determination concerning his neck and back pain were not supported by substantial evidence because the ALJ incorrectly stated that no doctor had described him as disabled; the ALJ incorrectly discussed his unsuccessful attempted return to work; and the ALJ mis-characterized his wood-working hobby.

When the Appeals Council issues a denial and not a decision, the court's review is "limited by statute to the final decision of the Commissioner, which is the judge's final decision." Piepgras v. Chater, 76 F.3d 233, 238 (8th Cir. 1996). The court has "no jurisdiction to review the Appeals Council's non-final decision to deny review." Id.

Rather, the court "determine[s] whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).

The Appeals Council declined to review the ALJ's decision. (Tr. 2.) Therefore, the ALJ's decision is the final decision for the court to review, including the new evidence. The new evidence plaintiff offered to the Appeals Council regarding his physical limitations were doctor's reports from Dr. Critchlow stating that plaintiff was disabled and unable to pursue work and the records from two visits to Dr. Trueblood which concerned plaintiff's shoulder.

The RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). When determining a claimant's RFC, the ALJ must consider "all relevant evidence" but ultimately, the determination of the plaintiff's RFC is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence. Id.; see also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000). The ALJ has a duty to fully develop the record. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). However, "that duty arises only if a crucial issue is underdeveloped." Id.

First, plaintiff argues that the ALJ's conclusions about his neck and back pain misconstrue the evidence and are not supported by substantial evidence. The ALJ found that plaintiff's allegations of total disability due to back problems not totally credible. (Tr. 27.) The ALJ listed three reports about plaintiff and his condition for why he did not find plaintiff fully credible. Id. Dr. Rawson limited plaintiff to a 40 pound lifting restriction. (Tr. 333.) Matt Rubel conducted a functional capacity evaluation and determined that plaintiff was able to lift up to 20 pounds. (Tr. 523.) Dr. Moore evaluated plaintiff and determined that he could perform up to a light exertional level with a 20-pound restriction and no overhead work. (Tr. 604-09.)

The ALJ then considered plaintiff's daily activities. (Tr. 28.) Plaintiff testified to shopping, going to the grocery store, visiting his cousin, and occasionally doing laundry. (Tr. 50-51.) The ALJ found these activities to be "essentially normal." (Tr. 28-29); see Moore v. Astrue,

572 F.3d 520, 524 (8th Cir. 2009) (holding that the ALJ properly discredited subjective complaints where the claimant's daily activities included doing household chores, preparing meals, and going out to eat). Then the ALJ considered plaintiff's work history, noting that the alleged impairment was present at approximately the same level of severity prior to the alleged onset date, and reasoning that the impairment did not stop him from working. This weighed against plaintiff's credibility. (Tr. 29.)

Despite plaintiff's argument, the ALJ considered evidence from the Brain and Neurospine Clinic. (Tr. 26, 575.) The ALJ also considered records after 2008; the ALJ noted a record from 2010 at the beginning of Step Two of the five step analysis. (Tr. 23.)

Second, plaintiff argues that the ALJ incorrectly stated that no doctor ever stated that he is totally disabled. (Tr. 27.) The ALJ was correct when he stated that "no doctor, including the claimant's treating physician, had ever stated that the claimant is totally disabled." (Tr. 27.) The ALJ did not receive the doctor's note from Dr. Critchlow because it was submitted only to the Appeals Council. (Tr. 4.) A doctor's opinion that a claimant is disabled is not controlling. 20 C.F.R. § 404.1527(e)(2)(ii); <u>see also</u> <u>Kovach v. Apfel</u>, 119 F. Supp. 2d 943, 970 (E.D. Mo. 2000) (ALJ can properly discredit treating physician with other specific medical evidence).

Moreover, Dr. Critchlow's opinion is contradicted by the notes from Dr. Rawson, therapist Matt Rubel, and Dr. Moore, all of whom opined that plaintiff could function at a light exertional level. (Tr. 333, 523, 604-08, 900.) Thus, there is substantial evidence in the record to support the ALJ's decision that plaintiff is not disabled, even after considering the new evidence. <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001) (holding that the ALJ's RFC determination was supported by substantial evidence where one doctor stated that the claimant could not work but four other doctors placed no such restriction).

Third, plaintiff argues that the ALJ's reliance on his attempted return to work ignores treatment provided by the Brain and Neurospine Clinic and is inconsistent with the ALJ's own finding that his work attempt after the first surgery was unsuccessful. The record shows that

the ALJ considered that plaintiff attempted to return to work following his first surgery. (Tr. 26, 330-32.)  While the ALJ did not reference the work readiness slips provided by the Brain and Neurospine Clinic, the ALJ referenced similar limitations in her decision.  The ALJ noted that Mr. Rubel limited plaintiff to a 20-pound lifting restriction and no overhead work.  (Tr. 523.)  These are the same limitations two of the  work readiness slips stated.  (Tr. 782-83).  While the ALJ may not have specifically addressed the record containing the  work readiness slips, the ALJ considered similar limitations. See Wiese v. Astrue, 552 F.3d 728, 733-34 (8th Cir. 2009) (looking to the entirety of the ALJ's opinion to determine whether the ALJ's RFC determination was supported by substantial evidence).

The ALJ summarized plaintiff's work attempt after the first surgery as unsuccessful, but not because plaintiff was unable to return to work. (Tr. 23.)  The ALJ stated "it is unclear from the record whether this work activity amounted to substantial gainful activity because he did not submit his pay slips.  It is likely this work activity amounted to SGA." (Tr. 23.)  The ALJ described it as an unsuccessful work attempt because plaintiff stopped working after the second surgery.

Fourth, plaintiff argues that the ALJ improperly discounted his complaints because he was able to continue his wood working hobby. Plaintiff gave up his wood working hobby only within the last few months; thus, he was able to continue his wood working hobby the majority of the time he claimed to be disabled.  (Tr. 46.)  The ALJ was lawfully considered an activity plaintiff engaged in the majority of time he considered himself to be disabled.

Therefore, the ALJ's RFC determination was supported by substantial evidence on the record as a whole; the ALJ did not misconstrue the evidence, did not mistakenly claim that no doctor had ever stated, plaintiff was not disabled, did not incorrectly describe plaintiffs unsuccessful work attempt, and did not mis-characterize the evidence.

## 2. Psychiatric Review Analysis

Plaintiff argues that the Appeals Council erroneously failed to conduct a psychiatric review technique analysis.

When a claimant claims a mental impairment, a psychiatric review analysis must be performed at each level of the administrative review process. 20 C.F.R. § 404.1520a(a). The claimant is first evaluated to determine if he has any determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). An impairment must result from any "anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508. The impairment must be established by medical evidence and not just the claimant's complaints. Id. If there is a medically determinable impairment, the ALJ must specify the symptoms and signs that substantiate the impairment and rate the degree of the functional limitations resulting from the impairment. 20 C.F.R. § 404.1520a(b)(1)-(2).

The ALJ must rate the claimant in the areas of "daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The process must be documented at each step when there is an evaluation of a mental impairment. Id. at (e). When the decision is made by the ALJ, the decision can be incorporated into his findings and conclusions. Id.

The Appeals Council must document its application of the psychiatric review when it issues a decision. 20 C.F.R. § 404.1520a(e). The Appeals Council will review an ALJ's decision for one of five reasons: (1) abuse of discretion by the ALJ; (2) error of law; (3) actions, findings, or conclusions of the ALJ that are not supported by substantial evidence; (4) there is a broad policy or procedural interest that may affect the general public interest; (5) and when new, material evidence that is related to the period on or before the ALJ's decision is submitted to the Appeals Council and the Appeals Council has found that the ALJ's actions, findings, or determinations are contrary to the weight of the evidence. 20 C.F.R. § 404.970(a)-(b).

The Appeals Council did not issue its own decision in this case. Instead, the Appeals Council declined to review the ALJ's decision. (Tr. 2.) The Appeals Council stated it had considered the reasons plaintiff disagreed with the ALJ's decision, as well as the additional evidence plaintiff had presented. (Tr. 1.) The Appeals Council found that the

information did not provide a basis for changing the ALJ's decision and declined to review the decision. (Tr. 2.) Because the Appeals Council did not issue a new decision, it did not have to perform a psychiatric review.

The ALJ determined that plaintiff has a mental impairment established by medical evidence. (Tr. 28.) The ALJ then considered the symptoms and rated plaintiff's functional limitations in the four broad areas outlined in 20 C.F.R. § 404.1520a(c)(3). Id. Finally, the ALJ stated that plaintiff's mental impairment is a severe impairment which warranted a reduction in the RFC to perform only unskilled work. Id.

The new evidence plaintiff offered of his mental impairment was a single visit to Dr. Hammond-Morrow. (Tr. 909-16.) While this evidence is new, that does not mean it necessarily would lead to a change in the ALJ's findings of fact, determination, or conclusions. The ALJ had determined that plaintiff had a severe mental impairment, which was the same conclusion Dr. Hammond-Morrow reached. (Tr. 28, 910.) Since the ALJ reached the same conclusion as Dr. Hammond-Morrow and restricted plaintiff's RFC accordingly, there is substantial evidence on the record supporting the ALJ's decision regarding plaintiff's mental impairment when considering the new evidence. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (holding that ALJ's RFC determination was not undermined by new evidence where it was still supported by substantial evidence on the record as a whole).

Therefore, the ALJ's psychiatric review analysis was sufficient.

## D. Significant Employment

Plaintiff argues that the ALJ erred by failing to demonstrate that there were significant jobs that he could perform.

At Step Five, "the burden shifts to the Commissioner to establish that [claimant] maintains the [RFC] to perform a significant number of jobs within the national economy." Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). "Vocational expert testimony is required at step five 'only when the claimant has non-exertional impairments'" Id. The ALJ can consider evidence of sufficient jobs in the economy in the testimony of a VE. Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998). The ALJ shows evidence of jobs by asking hypothetical questions to the VE

which reflect the abilities and impairments of the claimant as determined by the RFC.  Id.

An ALJ can determine from the testimony of a vocational expert whether jobs exist in the national economy that a claimant is capable of performing.  Bradshaw v. Heckler, 810 F.2d 786, 790 (8th Cir. 1987).  The ALJ is "required to produce vocational expert testimony concerning whether there are jobs available that a person with the claimant's particular characteristics can perform."  O'Leary v. Schweiker, 710 F.2d 1334, 1339 (8th Cir. 1983).

The ALJ asked the VE to assume a hypothetical person of plaintiff's age, education, work experience, and who was limited to the restrictions described in the RFC, and state whether there is work plaintiff could perform. (Tr. 77.)  The VE responded with three possible jobs:  usher, of which there are one thousand in-state and more than thirty thousand nationally; furniture rental consultant, of which there are three hundred in-state and more than twenty thousand nationally; and children's attendant, of which there are two thousand in state and more than one hundred thousand nationally.  (Tr. 78.)

The ALJ also asked the VE to consider the same hypothetical individual but limited to sedentary work.  The VE testified that this person could perform the work of customer service clerk, of which there are ten thousand in-state and more than one million nationally; information clerk, of which there are twelve hundred in-state and more than fifty thousand nationally; and telephone sales, of which there are five thousand in-state and more than one million nationally. (Tr. 78-79.)

The ALJ also asked specifically about unskilled sedentary work for the same individual.  The VE responded with surveillance system monitor, of which there are three hundred in-state and more than ten thousand nationally; and callout operator, of which there are around five hundred in-state and more than twenty-three thousand nationally. (Tr. 79.)

With this testimony, the ALJ properly established that there were jobs plaintiff could perform that exist in significant numbers in the national economy.  Gragg v. Astrue, 615 F.3d 932, 941 (8th Cir. 2010).

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


   /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 22, 2012.